Good morning. I would like to point out that a third justice will be participating in the discussion and reading the briefs and listening to the oral argument on tape. However, will not be able to join us today. I would also have a couple of housekeeping matters. These microphones do not amplify. They are only for recording. And the recording is not the latest generation. So you really have to speak up and articulate what you think is important. Not only for the recording, but also for us and clearly for the people who are in back of you who can't hear anything if you're keeping your voice down. And the only other thing that I'd like to do is point out that we only have one case today. So we have a little leeway on time. We won't be too fussy about it. I know that you're all professionals and we'll act accordingly. But we can begin if you'd please both come up and introduce yourselves. And the case will be called. 11-13-51 People v. Ricardo Harris. Thank you, Your Honors. My name is Brian Cook and I represent the appellant, Ricardo Harris. Good morning, Your Honors. Christine Cook on behalf of the people. Okay. No confusion there. May it please the Court, Counsel. Ricardo Harris' post-conviction petition identifies several pieces of exculpatory evidence that were not presented to the jury that convicted him based on shaky eyewitness identifications. This evidence supports Harris' claims that the State violated its due process obligation to disclose exculpatory evidence before trial and also supports his claim that his trial attorneys were ineffective. These substantial claims should not have been dismissed on the pleadings by the Circuit Court. Harris is merely asking at this stage for the opportunity to prove these claims at an evidentiary hearing and he has made the substantial showing necessary. Other than June Janeway's recantation, what other exculpatory evidence are you referring to? The other key piece of exculpatory evidence, and this is evidence going to the ineffective assistance claim, is primarily the evidence of excited utterances made by two of the victims to the shooting immediately after the shooting saying that there were two offenders, not one. But he knew about that. He did know about that, but it wasn't presented at trial. And so we do have a situation where we're arguing that counsel was ineffective for not presenting that evidence at trial. I just want to make sure I understand. Your Brady violation is based exclusively on the nondisclosure of June Janeway's recantation. That's correct, Your Honor. And getting to that, I believe that is the most important piece of exculpatory evidence in this case. June Janeway was one of only three occurrence witnesses who, before trial, had identified Harris as... Excuse me, counsel. Was she an occurrence witness? Did she see the shooting? She didn't see the shooting, but she was at the scene of the shooting immediately afterwards. That's why I identify her as an occurrence witness. Okay. Not exactly an occurrence witness. A place witness, perhaps. Sure. But, I mean, if we look at the timeline of what happened after the shooting, Jean and her husband Melville were the first people to arrive at the store after the shooting. Her husband walked in the store, and then according to her affidavit, right after that, she saw a man walk out of the store and walk past her car. Her husband didn't see anybody leave the store, did he? Her husband didn't. According to police reports, we haven't heard any testimony from him yet, and that's certainly something that could be explored at an evidentiary hearing. However, he walks into the store, and he sees four people who have been shot. So his attention would have been drawn to those four people, so it's very plausible in this story that someone slipped out after him, and that's who his wife saw. But there's nothing anywhere in the record that says that Jane White says that she saw the shooting. No, she didn't. It's clear that she got there after the shooting. But she was at the store. She saw a man leave the store and walk past her car. Let's be precise about that, because her original statement was that she was sitting in her and her husband's car in the passenger seat. The cargo van owned by the victims was immediately next to her car. That's correct. And originally she said she could not see the front door of the liquor store. But she was clear in her affidavit, which we do have to presume to be true at this stage of the proceedings, that she saw a man walk out of the store. She was able to see the front door, and she saw the man walk out. We've cited a lot of case law in the briefs stating that when there's a contradiction between witness's testimony, whether at trial or in a deposition, as in this case, and a witness's affidavit on post-conviction review, that affidavit, until you get to an evidentiary hearing, that affidavit must be presumed to be true. And that's the case here. So we – and regardless of whether she saw the man walk out of the store or not, we do know that she saw a man in front of the store walk past her car. And we know that she was there very shortly after the shooting. And the reason – So initially she identifies this individual as Mr. Harris after she sees his photo broadcast on the news, right? That's correct. A couple days after the shooting, she goes to the police and says, this is the man I saw in the parking lot. Well, initially she went to the police after seeing a composite sketch. She viewed a photo array and wasn't able to identify one. And then, you know, roughly three months later when Mr. Harris was arrested, at that point she viewed a lineup and identified him. And that was after having seen his photo in the media several times. And that was her explanation for why she had falsely identified him. So then tell me, let's assume that the state discloses her recantation. And so the substance of her testimony is, I saw somebody in the parking lot a few minutes after these shootings. I originally thought it was Ricardo Harris. I was wrong about that. It wasn't Ricardo Harris. Tell me what her trial testimony looks like. I think it looks very similar to that. I would disagree that she was there a few minutes after the shooting. We know that she got there, her husband went in, she saw the man. Her husband came out. As he was coming out, that's when a witness named Heather Duran was walking in. And we know from Helen Chisnick's trial testimony that she spoke to Heather Duran after being on the ground for only about 20 seconds after the shooting. So I don't think we're talking about a few minutes. I think we're talking about a much shorter period of time. Actually, I thought the record was that Ms. Janeway said her husband had been in the store for a couple of minutes before she saw this individual walk around. That was her deposition testimony. A police report about her testimony gives a different timeline. She says that just moments passed between the time her husband went in the store and the time that she saw the man in front of the store that walked past her car. So, again, this is something that that exact timeline should be addressed at an evidentiary hearing so that we have a better record to make this determination of the materiality of her testimony. So her testimony done at trial is, I thought I saw Ricardo Harris in the parking lot after the shootings, but I was wrong about that. The state says, no questions, Your Honor, and sits down. How does that undermine the confidence in the verdict in this case, which was based on eyewitness victim identification? Well, in a number of ways. First, I would like to point out that the eyewitness identifications in this case were not very strong. We have two witnesses who had been shot who testified at trial that they saw the shooter for only seconds before he shot them. He was armed, and we know from numerous studies that when a perpetrator is armed, it is much more difficult for a victim to identify that perpetrator because their attention is drawn very naturally to the weapon and not to the person's face. So wouldn't that be true in every case where a victim of a crime involving a weapon identifies the person who assaulted them? Well, every case is going to be different. That would be true in every case. Every case is going to be different because it depends on how long the victim is able to see the shooter. Here we know it was a very short amount of time. In some cases, that length of time is going to be greater. Maybe there are other factors that assist in the identification, but it sounds like you have a question, Your Honor. Go ahead. Okay. And there are other things that call into doubt their identification. When Christina viewed the photo array about 10 days after the shooting, she told a police officer that the shooter didn't look up and that she didn't get a good look at his face. That's just more evidence of how poor their opportunity to view the shooter was. We also have evidence showing that neither of them was able to describe the very noticeable scar that was on the right side of Mr. Harris's face. That's another piece of impeachment. In addition, both of them were described as making tentative identifications at the array. Obviously, I talked about Christina saying she didn't get a good look at the shooter's face, and she told the police officer who showed her the array that she was basing her identification on the shape of his head and his hairstyle. Helen told the police officer. She denied that. She denied that. She denied that. However, we know from the post-conviction petition exhibits that the officers documented that in a police report written at the time that they were shown the photo array. That's something that the police have no reason to make up or lie about. So the fact that Christina may not have remembered that years later, but the police documented it, and they were credible in testifying about that piece of impeachment. In addition, any time we're weighing a Brady violation, this is about do we have confidence in the verdict. We're asking is there a reasonable probability that the outcome would have been different, and what that means is in light of the evidence that wasn't disclosed, did we have a fair trial? Is the verdict in this trial worthy of confidence? In this case, I don't think we can say that's true. We have a case. This was a capital murder prosecution. The state had three witnesses who identified Mr. Harris as being at the scene of the shooting, and before trial, one of those witnesses told the state, admitted to the state, that she had lied. And the state kept that evidence from the defense, according to Gene Janeway's affidavit and according to defense counsel's affidavit. Those are presumed true at this stage. So we have a case in which the defense is preparing for trial, not knowing that one of the state's witnesses wasn't actually going to testify for the state and could have been an important witness for the defense. Well, but defense counsel, trial counsel, appointed to represent Mr. Harris, expressed, prior to trial, extreme skepticism about the likelihood that someone who had just shot four people would be hanging around in front of the liquor store after the event. And so he was expressing a lot of skepticism about Janeway's identification of Harris. Well, I'm not sure that that's the case. Again, I will go back to her affidavit. She said that she saw someone walk out of the store. That's something counsel didn't know. You know, he just had her deposition. All he knew is that she saw someone outside of the store who she identified as Harris. And we know counsel signed an affidavit for the post-conviction petition saying that if he had known what Janeway's actual admission to the state was before trial, he would have called her as a witness. But the admission, the only disclosure that would have been made prior to trial would have been, I was wrong about the person I saw outside the liquor store. Not that I saw somebody walk out of the liquor store. That only surfaced in her affidavit years later. Well, presumably if counsel learns that, counsel is then going to talk to her and ask further questions. I think that's, again, we're at a pleading stage, and we're kind of involved in a lot of speculation about what would have happened and, you know, what might have happened. Those are things that can be explored in a lot of detail at an evidentiary hearing. That's all Mr. Harris is asking for at this point is a chance to prove these claims at trial. I'd like to move on also just to the ineffective assistance claim because there's another piece of exculpatory evidence that wasn't presented at trial, and that's that Helen Chisnick and one of the male victims told two of the people who arrived at the store after the shooting, Heather Duran and Larry Lozano, that there were two perpetrators, not one, as Helen and Christina had testified to at trial. So how does that help Mr. Harris? Well, it's fairly well established. The main way that helps him is that both Christina and Helen testified at trial that there was only one perpetrator. So any evidence that, and this would have been admissible as substantive evidence. It wouldn't have been admissible as impeachment. It would have been admissible as an excited utterance, as an exception to hearsay. Right. And so Helen and Christine both testified. Were they cross-examined about their statement that there were two perpetrators? They were not. Okay. How is that not a strategy decision of trial counsel, knowing that these other statements exist? Well, first of all, trial strategy is a matter under case law that should be determined at an evidentiary hearing. When there is exculpatory evidence that counsel is aware of and doesn't present, and when you have a record like the record here that doesn't have any specific facts about what counsel's strategic reasoning was, you need to have an evidentiary hearing so that counsel can get on the stand and say, here's why I did this, and here's why I didn't do this. And then the courts can make an informed decision based on counsel's testimony about whether that strategy was reasonable or unreasonable. You know, Mr. Cook, I've seen a lot of cases involving post-conviction petitions where courts concluded that alleged ineffective assistance claims were based on trial strategy that did not involve evidentiary hearings. I would just point to People v. Tate and People v. Corvera, both cited in our briefs. In both of those cases, they were second-stage hearings in which the defendant was claiming that counsel was ineffective for failing to present exculpatory evidence. And in both of those cases, the court said, this court said, that that had to be determined after an evidentiary hearing. And the State has not addressed those cases or cite anything to the contrary. But you're characterizing the statements of the victims, that there were two perpetrators, as exculpatory. How does that help Mr. Harris? When they identified him, they tied the weapon to him, so what if there was somebody else present? It contradicts the account of the only two eyewitnesses to the shooting who both said at trial that there was one perpetrator. By contradicting their account, if they were mistaken about a fact as basic as how many perpetrators there were, then that allows the defense to make a much stronger argument that their observations and their memory are not reliable. Those were the identifications that were at the heart of this case, and this would have helped defense counsel impeach them. Well, they never said anywhere that there were two shooters. They never said anywhere two. They never said that. They never said there were two guys shooting. They never said that to the police. They never said that in the hospital. They never said that in their affidavits. They never said that, or in their depositions. They never said that. Helen and Christina never said that. They only ever said there was one shooter. And they identified that shooter as Harris. However, Heather Duran told the police, and this is in a police report, and also not in her affidavit, but it is in a police report, that one of the female victims to the shooting, and this would have been Helen because she was the only one at this point who was walking and conscious, that she told her at the store that two black men did this. So we have her statement at the store, and then we also have the statement of one of the surviving victims. So she said two black men came into the store and they appeared to be together, but one of them was actually the shooter. Well, that's not the statement that she made to Heather Duran. It was not quite that detailed. Did she ever say there was another shooter? No, she never did, and that's why this is important, because the statement that two black men did this would have called into question her testimony that it was only one black man. And it's not just her statement. There was only one gun, right? All the victims? There was only evidence of one weapon, and it wasn't, keep in mind, it wasn't just her saying this. It was also one of the decedents, one of the male victims to the shooting, said the exact same thing to Larry Lozano, and his test, that would also have been admissible as an excited utterance and as a dying declaration. It would have come in as substantive evidence, and it would have countered the state's account of the shooting. Well, who would it have come in through? Larry Lozano? It would have had to have come in through Lozano. Right, and so trial counsel asked for a continuance of the trial to locate and interview Mr. Lozano, and then the record is silent about what the results of that were, and he did not testify at trial. We know Larry Lozano was there and that counsel spoke to him, but again, I would get back to my point that strategic decisions, if we're going to ask what counsel's reasons were for not presenting testimony by Larry Lozano, that's something that has to be addressed at an evidentiary hearing, and case law is very clear on that. And so to that extent, we need to have counsel testify and say what did you learn from Larry Lozano, and why didn't you call him to testify? The record at this point is silent about that, and so we're speculating about counsel's strategic reasons and whether those strategic reasons are sound. It's important to note strategic decisions are entitled to deference, but they're not entitled to impunity. Counsel's strategic decisions have to be reasonable, and to make a determination of whether they're reasonable, we have to know exactly why counsel made that strategic decision, and we don't have that on this record. We need to have an evidentiary hearing to determine that. I would like to reserve a little time for rebuttal. We're not circumscribing your time, as Justice Puchinsky said. Why don't you address the waiver of counsel argument? I'll address that briefly. I think this kind of shares a common theme with the other claims, and that is that, again, we're not supposed to decide factual disputes on the pleadings at a post-conviction petition. At the second stage, all well-pleaded facts are presumed to be true, and here we have experts who looked at a lot of the same evidence and then a defense expert who did additional neuropsychological testing that have differing opinions about whether Mr. Harris was able to make and knowing an intelligent waiver of the right to counsel. We have competing expert opinions, and those experts should be testifying at an evidentiary hearing. We shouldn't be determining which one is credible and which one isn't just based on the pleadings. They should be cross-examined. They should be questioned in depth about their opinions before a decision is made that is binding. Isn't there evidence in the record that Mr. Harris was acutely aware of the disadvantages and risks of representing himself when initially he told the trial judge when he first brought up the prospect of representing himself, you know, I've decided against that because in prison I don't have access to the law library on a regular basis,  and then after he represents himself for 18 months, he says to the trial judge, you know, I really appreciate the risk of going to trial representing myself and I don't want to assume that risk. Will you appoint trial counsel for me? Isn't that the best indicator that he understood exactly what he was doing? I don't believe it is. His understanding about his access to the law library is a rather small point in the greater scheme of all the disadvantages of counsel. That's just one minor one. And we have a lot of evidence that the true reason for his waive of the right to counsel were these delusional conspiracy theories. So if we look at all the things that he said before he waived counsel, if we just take his statements about the law library in isolation and don't consider these delusional conspiracy theories, I think we're getting kind of a limited viewpoint about his mental capacity at the time he made that decision. We can't just look at one circumstance to the exclusion of all others. You have to look at the totality of the evidence about his mental state. And that's what the experts here did, and they came to different conclusions. And it should be up to the circuit court in the first instance to hear testimony by them and to make a determination based on all of the evidence, not just a few statements Mr. Harris made in isolation. Was it just a few statements? Did it also include the depositions and the motions that he filed while he was representing himself, which appeared to be lucid? Again, at the same time that he was doing those things, he was continuing to press these delusional theories about his indictment being forged and his extradition being forged and things like that. He continued to press those theories at the same time that he was doing depositions. So I think that creates an open question about just exactly how confident he was at this time. The trial judge did order an exam. Correct. And that did go over the risks, not once, but more than once. He did them orally and in writing. But again, the trial judge's admonishments, most of those are yes, no questions where defendants either answering yes, I understand what the possible penalties are, yes, I understand the nature of the charges against me. Those don't give us a whole lot of insight into actually what Mr. Harris' mental capacity was. We have an expert who after trial has done rather extensive testing on his neuropsychological and cognitive abilities and had a lot more information than the trial judge had at his disposal at this time. Well, the trial judge had the forensic exam. Right. The trial judge had forensic clinical services report. However, forensic clinical services didn't do any of that neuropsychological testing either. Dr. Sulzberg just talked to Mr. Harris, reviewed some transcripts, reviewed some of his medical history, but didn't do all of the testing that Dr. Hanlon did on post-conviction review. So again, we have competing experts. We have an expert who did a more thorough review of Mr. Harris and came to a different conclusion than the State's expert. And that is something that should be addressed in an evidentiary hearing. Just to conclude, if Your Honors have no further questions, Mr. Harris has made a substantial showing that the State violated its duty to disclose exculpatory evidence and that his trial attorneys weren't effective for failing to present additional exculpatory evidence. He was convicted based on questionable eyewitness identifications, and his post-conviction petition contains exculpatory evidence that would have further undermined those identifications had it been presented at trial. Harris' petition should not have been dismissed on the pleadings, and he respectfully requests that this Court remand his case for the evidentiary hearing to which he is entitled. Thank you. Thank you. Ms. Cook. Good morning, Your Honors. May it please the Court, counsel. There are a lot of facts that have not been elicited by the defendant before this Court that I'd like to clear up. And if it's okay with this Court, I'd like to start backwards with the waiver of counsel issue. First of all, there is no remedy for the waiver of counsel. The defendant only proceeded pro se for about 18 months. There is no other allegation that he was in any way prejudiced by his pro se proceedings. There is no underlying Strickland claim that counsel could have, should have, redeposed anybody or redone any of the things that were done when he was pro se. Since there is no legal underlying basis, there is no remedy available for this. These kinds of cases are usually reserved for the types of cases in which counsel has been completely denied. Not in cases such as this, where this record is absolutely replete with this defendant's adamant, adamant discussions about proceeding pro se. I will dare say that this Court probably will never find a record like the one before it today, where Judge Sterba took five months in order to allow the defendant to exercise his constitutional right to proceed pro se. His constitutional right, a bedrock of law. Had Judge Sterba denied that constitutional right, I would undoubtedly be before this Court on another constitutional violation of the other end of this argument. The trial court in this case clearly found, and properly so at post conviction, that there was no reason not to let this defendant proceed pro se. Dr. Selzberg performed a very comprehensive examination. Judge Sterba didn't even need to have this judge BCS, but in an abundance of caution, and after months and months of repeated admonitions in writing and in oral, and after his painstaking admonishments, finally allowed this defendant to proceed pro se. This is not the type of issue that's going to proceed to a third stage hearing. Dr. Hanlon is nothing but doing a contradictory statement. That's a reasonable doubt argument. Dr. Hanlon's affidavit before this Court does not warn a third stage hearing, because Dr. Hanlon never undermines Dr. Selzberg's finding in the first place. He just offers a contradictory opinion. There is always going to be an expert that can offer a contradictory opinion, and the Post-Conviction Hearing Act does not allow a third stage hearing, because somebody is offering a contradictory opinion. In order for a third stage hearing to proceed on the basis of Dr. Hanlon's affidavit, he would have to have some type of legal or scientific undermining of her original opinion that his right to waive counsel was improper. And there is nothing before this Court in that notion. Further, Dr. Hanlon's affidavit cites an erroneous standard. He claims within a reasonable degree of medical and psychiatric certainty. That's the proper standard. Dr. Hanlon claims to a reasonable degree of neuropsychological certainty. I don't know what that means. I've never seen it in a document before. It's not recognized, and Judge McSweeny-Moore recognized that below as well. Is there any case that talks about the appropriate standard? No, there is not.  Right, right. And in this case, it would be medical and psychiatric certainty. And keep in mind, Dr. Hanlon had all of Dr. Sulzberg and Dr. Schwartz's reports from Michigan. But what Dr. Hanlon was saying was not that Mr. Harris suffers from a psychiatric disorder, but it's a neuropsychological disorder. Correct. Caused by head trauma. Right. So is it necessarily that he has to have a psychiatric problem before the competency to waive counsel is implicated? Yes, because that implication of waiving counsel is not a psychological issue. It's a psychiatric issue. And there is no case law on this, but that's not the right standard in the first place. We don't even know that Dr. Hanlon is competent to make this claim. His curriculum vitae in no way indicates that he's ever made this evaluation before, that he's familiar with the standard, or that he understands what he's doing. Just because he's a psychologist doesn't mean he's an expert that's competent to offer an opinion in this field. I'm not bringing in somebody, a medical doctor, to remove my gallbladder. He may be an expert in that, but he's not an expert in this. And he doesn't undermine Dr. Sulzberg in any way, shape, or form, which makes this a reasonable doubt argument, which is improperly before this Court. Dr. Hanlon also didn't review many of the pertinent records before the Court. He didn't review the two dates where Judge Sterbault repeatedly admonished the defendant about proceeding pro se. He didn't review the 18 months of the pro se litigation, including the depositions conducted by the defendant, the motions filed by the defendant. He only reviewed the sentencing and three court proceedings. And further, he didn't even review Dr. Sulzberg's 16-page psychiatric summary. That in and of itself is not a credibility finding at the second stage. Those are findings of fact. These things are just missing. And below, Judge McSweeney more properly found that there was no basis to grant a third stage hearing based on a reasonable doubt argument offering a different opinion from Dr. Sulzberg, whose original opinion was sound and has never been challenged by Dr. Hanlon. As it pertains to the Strickland claim, again, this Court is the beneficiary of a very unique record before it. And again, I'm going to assert that rarely will this Court find a record that is so contradictory to a notion of incompetence of counsel. This record shows that Mr. Fahy and Mr. McQuaid were originally appointed to represent the defendant when he was claiming that his assistant public defender, John Conniff, was incompetent. They were originally appointed, came in to do what would in effect be a sort of a crinkle hearing. The defendant refused to cooperate. They conducted an investigation. They wound up holding a hearing without presenting evidence. That was denied, and they were allowed to withdraw. Where is it in the record that the defendant refused to cooperate in the hearing regarding the ineffective assistance of the public defender? Both of the attorneys state that, that they cannot present his testimony because he refused to testify and he refused to cooperate. And so they had to rest on the pleadings. They were forced to rest on the pleadings, and in a rather apologetic way as well. It was clear from a cold record on appeal that these attorneys were embarrassed to go forward with these proceedings. And yet, with all of the time that assistant public defender Conniff and Mr. McQuaid and Mr. Fahy had with this defendant, years of time, not one of those attorneys ever claimed that this defendant was unfit for trial, and none of those attorneys ever requested a BCX hearing, which is most telling. These are experienced capital litigation people. These are not some fly-by-night misdemeanor assistants who don't know how significant it is to have a person fit for trial as a client. That is also very telling. In any event, on the Strickland claim, Mr. Fahy and Mr. McQuaid were reappointed the defendant's case about three and a half years after the arraignment. This case had been repeatedly set for trial when he finally wised up and decided, I think I better get an attorney. This is a capital case. They moved heaven and earth to prepare for this trial. They went through all of the evidence in the guilt phase in 30 days. They were going to a capital murder trial within a year. This evidence and this record could not be more replete with the fact that they were chasing down witnesses in Mississippi going to the second offender theory. They were flying back and forth. They had second investigators out and first investigators out in Michigan looking for mitigation evidence. There was no stone unturned by these two defense attorneys who are now being alleged incompetent for failure to re-interview Gene Janeway. They didn't re-interview Gene Janeway because she was a waste of their time. Ms. Janeway, as Mr. McQuaid put in his post-conviction affidavit, was not re-interviewed. We chose not to call her as a witness at defendant's trial because we did not believe she had any information which would be helpful to the defendant's defense. That is a strategy call. That is a piece of this record that this court has before you, which is evidence that they knew about Gene Janeway and they chose not to re-interview her. But it's undisputed that they didn't know about her recantation. Correct. Correct. But as far as counsel said earlier that strategy is a matter for a third stage hearing, that is absolutely untrue. Matters of trial strategy are very well recognized in this law as matters that can be dismissed at the second stage as it was in this case. Counsel is just incorrect about that. Further, the notion of the two offender theory is forfeited. This claim was never litigated below in the post-conviction claim and it should not be heard for the first time before this court now. The two offender theory, however, it should be noted, is only alive because there are a few Oak Lawn Police Department reports which have the two offender notion in them. Specifically, there's an Oak Lawn Police report regarding Larry Lozano, where he claimed he approached the rear of the store and he observed one of the male murder victims bleeding and he was trying to comfort one of the Patel men who ultimately expired from the gunshot wounds. He asked the victim what happened and one of the Patel brothers stated that two male blacks did this. That is in a police report. That cannot be used to impeach Christina or Helen Shiznik, who never stated that there were two offenders, two gunmen, two anything. Again, this record is absolutely replete with contradictions to that notion. There's also a claim that counsel made today that Helen told Heather Duran that two male blacks came in and shot up the place. That is, in fact, in an Oak Lawn Police Department report where Heather Duran apparently told an Oak Lawn police officer that she ran into Helen at the front of the store when she first came in and Helen told Heather, I've been shot, there are three more people back there, two black men came in and shot everyone. However, what counsel has failed to tell this court this morning is that in the pretrial statement to a public defender's investigator, Heather Duran again said, I ran into presumably Helen at the front of the store. She told me she was shot and asked me to call the police. I cannot remember what else she said. Record common, C-205. There is no impeachment available. Further, Heather Duran in her post-conviction affidavit denied, I'm sorry, she denied in the deposition and the trial that there were ever, two offenders at any point. There is simply no evidence that there's any available impeachment for Helen on this point. There's no impeachment available on Christine, which we noted in our brief. There's not a single record site that has Christine making these statements because she was shot up pretty badly in the back of the store and was in ICU for a few weeks. So that claim to Christine has absolutely no factual foundation. There's no foundation for Helen's other than this police report, which cannot be used to impeach her and which Heather Duran has removed herself from. What do you make of the suggestion that Melville Janeway was in the store either before the other two or at the same time of Ms. Duran and the other, Larry Lozano? What does the record show about the timing of Melville Janeway's death? For what my opinion is worth, this is how I have read the record on the timeline. Originally before the shooting, Jesse Lee, Jr., who was found in Mississippi by defense counsels and was ultimately called at trial, he was originally in the liquor store. This was before Christine and Helen even got there. And he noticed an African-American man with a fishing hat and a lazy eye who had gone to the back of the store and he was asking for the little bottles of alcohol, which he said he thought was suspicious because everybody knows the little bottles are sold up in front by the cash register. And apparently there was also a Hispanic man in the liquor store. Whether or not they were together, nobody really knows. But the African-American man with a small liquor bottle request was kind of catching his attention. And there was ultimately a composite sketch that was made by Mr. Lee of that man, who was never a suspect but only a possible witness. This was another issue that was raised by the ineffective assistance of counsel that goes to the two-offender theory as well. There were three composite sketches made. I believe three of them were done by Mr. Lee. And those composite sketches were all ultimately determined to be potential witnesses, not offenders. And then there was a composite sketch made, I believe it was two days after the shooting, by Helen. She made the original composite sketch of the defendant, which was originally aired. So my timeline, the way I read it, is Mr. Lee left the store, and I'm also under the impression that these two men are either in the store or have left in front of him. He also noticed, Mr. Lee, when he left the liquor store, that there was a white Buick in the parking lot with another African-American in it, which is in the police reports, too. So there was apparently some police investigation about the white car. Well, Helen and Christine say when they pulled in the parking lot, there were no cars there. Right. So presumably everybody's out of the store. They pull in in their, like, large van in the parking lot, and they walked in. And according to them, other than the Patel brothers, there was nobody else in the store. The shooting took place, and somewhere around this time, Heather Duran is driving down Cicero Avenue looking for cigarettes. She sees two African-American men running down Cicero. Again, in what capacity, we don't know. She identified one of the first ones. She goes, I know that one was definitely African-American. He was wearing a green sweater and khaki pants, which doesn't match anything about what Gene Janeway said. She drives to a gas station down the street. Cigarettes are too expensive, so she leaves and estimates it's about five minutes from the time she saw the African-American men running to the time she gets to the liquor store. As she's walking into the liquor store, Mr. Janeway's coming out, and he's telling her, don't go in there. You know, it's a bloodbath. She goes in anyway, and apparently that's where she runs into Helen at the front saying, call the police, I've been shot. And then sometime after that, there's a canvas of the neighborhood and people in a trailer park are interviewed across the street about potential witnesses, anybody, and nobody really has any information. It's really unknown, you know, exactly how the defendant left the store, which direction he fled in, did he run, was he in a car. There's no evidence about any of that whatsoever. But there's the timeline between Heather Dransing, I saw these two men and there was a five-minute delay. That doesn't seem to be. Helen says the woman she spoke to, that she pretended to be dead for about 20 seconds, and then she saw a woman come into the store and spoke to her. So if Heather Duran entered the store as Melvin Janeway was coming out, then Melvin would have been in the store before her. Yes, I believe he was. I think he was fleeing the store as Heather was coming in. That's my interpretation. But what does that do to Mrs. Janeway's statement that he was in the store for two minutes? Helen says she pretended to be dead for 20 seconds, and then she talked to Heather. So where's the other minute and 50 seconds of Mr. Janeway? What happens to that? I have no idea. We have no idea. But let's talk about Jean Janeway, which seems to be the crux of the argument today. Jean Janeway is she and her husband are near the liquor store. They're parked over on the far right side. Christine and Helen's van is right next to them, and the entrance to the liquor store is over here. Now, she testified at her deposition that she couldn't see the entrance of the liquor store because it was blocked by Christine and Helen's van, okay, and that once her husband had gone inside the liquor store, at some point she looked up and there was an African-American man between the liquor store and her car. He seemed to be surprised, and he hurriedly walked, ran, fled, however you want to characterize her testimony, to the rear, presumably back towards Cicero Avenue. So originally she's the one who calls the police but doesn't offer any information to the police when they respond to this double murder and double shooting. She shows up two days later on her own. Oh, I recognize this composite. That's the guy I saw in the parking lot in front of my car. Okay. Well, then she winds up IDing the defendant's photo, and she identifies him in a physical lineup in August when he's apprehended in North Carolina. In her deposition conducted by the defendant, she says there was a black man in front of the store. I could not see the entrance. She described the defendant as 5'10", 5'11", 170, mid-30s, short hair, brown pants, tan shirt. In her recant affidavit, she saw the man leaving the store, which was a physical impossibility. He's now only 25, 5'6", he only weighs 140, and now he's got long hair sticking out of a baseball hat. This is in complete contradiction to her deposition testimony. When Jean Janeway's affidavit, her post-conviction recant affidavit, is submitted, almost all the time you have to assume that to be true unless that evidence is positively rebutted by the record. In this case, it's not just positively rebutted by the record. She's telling the court, I didn't just make a mistake in identifying the defendant. I lied. I committed perjury. You don't get any more rebutted by the record than a perjury claim. As a matter of law, the post-conviction court did not need to take her affidavit as true because it was positively rebutted by the record. And further, it's a recant affidavit, which the law also recognizes is inherently unreliable and trustworthy. Counsel mentioned today that maybe Melvin would be helpful at a third state hearing. Well, Melvin's not going to testify at a third state hearing because he's never been at issue down below or even by this court today, and I wanted to get that cleared up, too. The Brady violation cannot be established because defendant cannot establish materiality. As you noted earlier, Justice, okay, let's say we disclose to Mr. McQuaid and Mr. Fahey. We have Jean Janeway, and she's coming off the ID. Who's going to present her? The state's attorney is not going to present her. She was originally listed as a witness but was never called as a witness because she didn't see anything. She's not material. She didn't see the crime. Who knows what she saw in front of her because every time you interview, it's something completely different. She's not material in any way, and because she's not material in any way, because she cannot impeach Christine or Helen, because she cannot impeach the specific gun evidence that was found, which was really a significant linchpin in this case, Jean Janeway is affidavit. Everything about Jean Janeway disappears because she's not relevant, because she cannot change the outcome of this trial, which was noted by the lower court in her ruling. Christine and Helen were very specific and very certain of their identifications, notwithstanding all of the allegations about how they were shaky. That's absolutely untrue. Christine identified the defendant at the first opportunity. When the cops showed up and showed her a photo spread, she hadn't seen anybody. She hadn't talked to anybody. She was in ICU completely isolated. She picks out the defendant's photo. Two days after Helen was out of the hospital, she was out like in a day or two, she comprises a composite of the defendant. They're not exposed to media coverage. They're the ones that started the whole identification process. The media exposure was a result of their identifications of the defendant. They're putting the cart before the horse, and those simply aren't the facts that were listed in this case. Jean Janeway's affidavit is rebutted by this record, by her ever-changing descriptions of what she could see and what this offender looked like. According to Peoples, this court and the lower court did not have to take her affidavit as true. This is not evidence that is impeaching, and it is not the type of evidence that's of such a conclusive character that would have changed the outcome of the trial. Regarding this giant scar on the side of the defendant's face, it's not in our brief, but I'd like to address it now, in one of the depositions, and I believe it was the deposition of Helen. If it's not in your brief, Ms. Cook, you probably shouldn't address it. Okay, well, it's in the deposition that she couldn't see it. It's before the court. The State's case did not just rest upon the identification of Helen and Christine. There was a very unique murder weapon used in this case. The defendant disarmed a guard in Michigan a week before and stole her Glock. That Glock was the same type of gun that was used in this case. The defendant tried to sell the Glock to Frank Cerulli. The bullets in the casings were from a .40 caliber jacketed Hydroshock with hollow point bullets, a distinctive ammunition of an elliptical firing pin, which only belongs to a Glock, which is manufactured by one exclusive federal company that provides the bullets to people, such as the armed guard in Michigan, which was disarmed by the defendant. So this case was not just based on the identification evidence of Christina and Helen. There was overwhelming evidence of this case. There is no credible evidence before this court that would warrant a third stage hearing on any of the allegations before it. There was no Brady violation. There is in no way a conceivable credible claim of ineffective assistance of counsel, and there is no credible claim that the defendant improperly waived his right to self-representation or that there should have been a hearing for his fitness to stand trial. Barring any questions from this court, the people respectfully request that this court affirm the post-conviction dismissal at the second stage of the defendant's post-conviction petition. Thank you. Thank you. Briefly a rebuttal, Your Honors. I'd like primarily to talk about Gene Janeway and rebuttal, but I will take questions on other issues if you have them. The first point I would like to make is that the State in its argument today, in its argument in its brief, and in its argument before the circuit court has repeatedly said that Gene Janeway's affidavit need not be deemed true at this stage of the post-conviction proceeding because it is contradicted by her deposition testimony. As I've pointed out many times, that is wholly inconsistent with the Illinois Supreme Court's explanation in People v. Coleman of what it means to be positively rebutted. The State has not once addressed People v. Coleman in any of its arguments, and Coleman held quite clearly that even though, yes, when an evidentiary hearing is held, we can deem a recantation to be inherently unreliable, it said that that's a premature argument at the second stage. And even when a witness's trial testimony is inconsistent with their recantation affidavit in the post-conviction petition, that affidavit must still be deemed as true until an evidentiary hearing is held. Okay. So let's assume Gene Janeway's affidavit is 100 percent true, and that the person she saw outside the liquor store was not your client. Where does that undermine the outcome of the case? Again, given the timing, and the State recognized that Ms. Janeway saw this person before Heather Duran spoke to Helen Chisnick about 20 seconds after the shooting. So given that timing, we know that it must have been pretty soon after the shooting that she saw someone right at the location at which the shooting occurred. So that shows that that person is likely the shooter. And if it wasn't Mr. Harris, who she's identifying... How does it show the person is likely the shooter? Isn't it more likely the shooter would be trying to get away fast? Well, if... Instead of sauntering around the parking lot? Not necessarily. Sometimes, you know, there's the idea of hiding in plain sight kind of, you know, not drawing attention to yourself by running. We don't have any evidence. But given how soon, that it's just seconds after... We don't know that. We've already pointed out that there's a discrepancy in the timing. Janeway says her husband's in the store for a couple of minutes. Two minutes. At one point, two minutes. Another point, a couple of minutes. And then Heather says she's in the... Helen says she pretends to be dead for 20 seconds, and then she sees Heather. She apparently never saw Mr. Janeway. Because he's already gone. He was in the store. So if she's pretending to be dead for 20 seconds, and he's in the store for two minutes, there's something odd about that. Well, that was Janeway's deposition testimony of the two or three minutes. But she had told the police that it was just seconds that he was in the store. Well, what she told the police wasn't under oath, was it? It was not. But it is part of our record. Which is what her deposition was? It was. And her affidavit was? Correct. Well, was sworn to. So why would... But I still don't... Joining my colleague, I still don't see how that does anything to undermine the case against Harris as a shooter. So she saw another guy in the parking lot. Big deal. That's a person that the State, at the time that she was identifying him as the shooter... She wasn't identifying him as the shooter. She was identifying him as a guy in the parking lot. As the time that she was identifying that person as Harris, the State was treating her as a witness. She was listed in their answer discovery. They were not seemingly troubled by the timing of her observations. They still thought, as long as she was willing to identify that person as Harris, they were willing to reasonably conclude that he was the shooter. She wasn't identifying him as Harris. She was identifying him as the man that she saw in the parking lot. That's when I say him. I apologize for being unclear. She identified Harris as the man she saw in the parking lot. And as long as she was willing to identify him, that man, as Harris, the State was treating her as a witness to corroborate the identification of Helen and Christine. Excuse me. I'm positive that we could go on this timeline for a long time. But can we fast forward to the weapon? Sure. That was going to be my next point. I would just point out, no actual murder weapon was ever found in this case. So we don't have a direct link. All we have is kind of the circumstantial evidence that the same type of mass-produced gun and bullet were used in the shooting as were taken from the Zilko. Wait a second. We've got a distinctive weapon, a Glock. Right. A mass-produced item. With sole source ammunition, the same type of ammunition that was recovered. Again, mass-produced items. And Sorelli calls the police and says, I have some information for you. An individual known to me as Mr. Harris was in possession of a .40 caliber Glock with a 13-point clip trying to sell it. That's correct. However, Mr. Sorelli, Frank Sorelli, he's not exactly our most credible witness. Well, excuse me, counsel. The officer, the corrections officer from Michigan, she definitely had Harris. There's no doubt that she was talking about Harris. I'm certainly not contesting that. Yeah, no, no, no. No question that it's this Harris. There's no question that he escaped with her Glock. There's no question that he escaped with her Glock that was loaded with this very distinctive sole source ammunition. And there's no doubt that this sole source ammunition was, in fact, the four bullets that hit these victims. Well, we don't know that it was her exact ammunition. We never have a gun found to actually match to the murder weapon. If you had a gun found that matched the murder weapon with Mr. Harris's prints on it, we wouldn't be here. Probably not, but we don't is the point. Did the State have 100 percent of the evidence it would like to have had? No, but what it had here, you know, it's kind of the difference between DNA evidence and blood type evidence. Actually finding a murder weapon would be kind of akin to DNA evidence. Here, all we have is we know that he had the same category, the same type of gun and bullet that were used in the shooting, but we don't have a direct match. We just have a circumstantial match, and that is tied together by a guy who tried to extort the police in exchange for his testimony. So we don't really have credible evidence. And when you take into consideration all the weaknesses in the identification evidence and the ways in which Gene Janeway's testimony could have been used by the defense to challenge that identification evidence, we do have, at least at this stage, a substantial showing that this was not a verdict that is entitled to confidence, that there is a reasonable probability that the outcome would have been different had the State disclosed in this capital murder trial that a witness admitted to lying when identifying Harris as a man that she saw at the scene of the crime. If Your Honor has no further questions, we would respectfully request that you reverse the dismissal of the petition and remand for an evidence hearing. Thank you. Thank you all for your excellent briefs and good arguments. We will take this case under advisement.